UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LOLETA M. MOTT, on behalf of herself and** ) | |
| **all others similarly situated,** ) | **CLASS ACTION** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **C. A. No. 12-1292** |
| ) | |
| **STONECREST MANAGERS** ) | |
| **and** ) | |
| **JON O. FREEMAN,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER PRELIMINARILY APPROVING SETTLEMENT
## AND DIRECTING NOTICE TO CLASS

The Court, having reviewed the Settlement Agreement entered into by the parties, hereby

Orders that:

1.    Upon the stipulation of the parties, the Court certifies a class for settlement

purposes only (the "Settlement Class"), pursuant to Fed. R. Civ. P. 23(b)(3), as follows:

> All homeowners to whom Defendants Stonecrest and Freeman have sent a
> letter substantially in the form attached to the Complaint as Exhibit A.

If the settlement is not finally approved, Defendants' stipulation to certification of the Settlement

Class shall not be binding.

2.    The Settlement Agreement entered into between the parties as of November 26,

2012, appears, upon preliminary review, to be fair, reasonable and adequate to the Settlement

Class.  Accordingly, the proposed settlement is preliminarily approved, pending a Fairness

Hearing as provided for herein.

3.    The Court finds the prerequisites to a class action under Fed. R. Civ. P. 23(a)

have been satisfied for settlement purposes in that:

(a)     there are 437 members of the Settlement Class;

(b)     the claims of the Class Representative are typical of those of the other members of the Settlement Class;

(c)     there are questions of fact and law that are common to all members of the Settlement Class; and

(d)     the Class Representative will fairly and adequately protect the interests of the Settlement Class and has retained Class Counsel experienced in consumer class action litigation who have and will continue to adequately represent the Settlement Class.

4.      The Court finds this action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) for settlement purposes because (a) a class action is superior to other available methods for the fair and efficient adjudication of this controversy, and (b) questions of fact and law common to the members of the Settlement Class predominate over any questions affecting only individual members.

5.      Pursuant to Fed. R. Civ. P. 23, Plaintiff Loleta M. Mott is certified as the Settlement Class Representative. This Court certifies the firm of Francis & Mailman, P.C. as counsel for the Class "Class Counsel").

6.      The Court will hold a Fairness Hearing pursuant to Fed. R. Civ. P. 23(e) on _____, 2013 in Courtroom _____ at _____, _.m. for the following purposes:

(a)     To finally determine whether this action satisfies the criteria for class certification set forth in Fed. R. Civ. P. 23(a) and (b);

(b)     To determine whether the proposed settlement is fair, reasonable and adequate and should be granted final approval by the Court;

2

(c)     To determine whether a final judgment should be entered dismissing the claims of the Class with prejudice, as required by the Settlement Agreement;

(d)     To consider the application of Class Counsel for an award of attorney's fees and expenses, and for an individual settlement award to the Class Representative; and

(e)     To rule upon other such matters as the Court may deem appropriate.

7.     (a)     Within thirty (30) days of entry of this Order the Settlement Administrator shall send the Notice in the form attached to the Settlement Agreement as Exhibit B to the last known first class mailing address of Settlement Class Members reflected in Defendants' records. For all Notices returned undeliverable, the Settlement Administrator will engage in one round of skip-tracing and attempt to locate a good address to which it will re-send Notice to such Member.

(b)     Not later than twenty (20) days before the Fairness Hearing, the Settlement Administrator will cause a declaration to be filed with the Court that the Notice described above was given as required herein.

8.     The Court finds this manner of giving notice fully satisfies the requirements of Fed. R. Civ. P. 23 and due process, constitutes the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons entitled thereto.

9.     The costs of printing and mailing the Settlement Notice and administering the settlement shall be paid by Defendants.

10.     If a Settlement Class Member chooses to opt-out of the Settlement Class, such Settlement Class Member is required to submit a request for exclusion to the Settlement Administrator, post-marked on or before the date specified in the Class Notice, which shall be no later than thirty (30) days before the date of the Fairness Hearing or as the Court otherwise may

3

direct. A Settlement Class Member who submits a request for exclusion using the procedure identified above shall be excluded from the Settlement Class for any and all purposes. No later than ten (10) days prior to the Fairness Hearing, Class Counsel shall prepare and file with the Court, and serve on Defendants' Counsel, a list of all persons who have timely opted out of the Settlement Class, as compiled by the Settlement Administrator. At that time, Class Counsel shall also supply its determinations as to whether any request to opt out of the Settlement Class was not submitted timely, and provide written notification to any Settlement Class Member whose request to opt out of the Settlement Class was not submitted on a timely basis.

11. A Settlement Class Member who does not file a timely a request for exclusion shall be bound by all subsequent proceedings, orders, and judgments in this action. Any Class Member who submits a timely request for exclusion may revoke his or her request for exclusion by submitting to the Settlement Administrator a written statement of revocation, postmarked or received no later than fourteen (14) days before the date of the Fairness Hearing.

12. No later than ten (10) days prior to the Fairness Hearing, Class Counsel shall prepare and file with the Court, and serve on Defendants' counsel, a list of all persons who have timely objected to the settlement.

13. All briefs, memoranda, petitions and affidavits to be filed in support of final approval of the settlement, for an individual award to the Settlement Class Representative and for an award of attorney's fees and expenses shall be filed not later than ten (10) days before the Fairness Hearing.

14. The Court retains exclusive jurisdiction over this action to consider all further matters arising out of or connected with the Settlement Agreement.

BY THE COURT:

_____
LAWRENCE F. STENGEL, U.S.D.J.

Dated:

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LOLETA M. MOTT, on behalf of herself and all others similarly situated,** ) | **CLASS ACTION** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **C. A. No. 12-1292** |
| ) | |
| **STONECREST MANAGERS, et al** ) | |
| ) | |
| **Defendants.** ) | |

### MOTION FOR PRELIMINARY APPROVAL OF CLASS
### ACTION SETTLEMENT AND NOTICE TO CLASS

Pursuant to Fed. R. Civ. P. 23(c), and for the reasons set forth more fully in the attached Memorandum of Law, Plaintiff Loleta M. Mott moves the Court for an Order preliminarily approving the settlement of this class action, approving the form and method for providing class-wide notice and scheduling a hearing at which the following will be considered: request for final approval of the proposed settlement, entry of the Final Judgment and Order and Plaintiff's request for approval of agreed-upon fees and costs. Defendants do not contest the requested relief.

Dated: November 27, 2012              Respectfully submitted,

                                      *s/ David A. Searles*
                                      James A. Francis
                                      David A. Searles
                                      FRANCIS & MAILMAN, P.C.
                                      Land Title Building, 19th Floor
                                      100 South Broad Street
                                      Philadelphia, PA 19110

                                      Attorneys for Loleta Mott and Settlement Class

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LOLETA M. MOTT, on behalf of herself and all others similarly situated,** | ) | **CLASS ACTION** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C. A. No. 12-1292** |
| | ) | |
| **STONECREST MANAGERS** | ) | |
| **and** | ) | |
| **JON O. FREEMAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND NOTICE TO CLASS

Plaintiff Loleta M. Mott moves the Court for preliminary approval of a settlement of this class action pursuant to Fed. R. Civ. P. 23 of the Federal Rules of Civil Procedure, and to approve the proposed form of notice to the Settlement Class.[1]  With the Settlement Agreement, which is filed as Appendix I hereto, Plaintiff also submits: the proposed Order of Preliminary Approval (Exhibit A to Settlement Agreement); the proposed notice of settlement (Exhibit B to the Settlement Agreement); and, a proposed Final Order and Judgment (Exhibit C to Settlement Agreement).

The substantive terms of the Settlement Agreement were negotiated vigorously and through zealous advocacy.  Class Counsel are experienced consumer class action attorneys who are well-qualified to evaluate the proposed Settlement Agreement on behalf of the Class.

---

[1]     The Settlement Class is defined in the Settlement Agreement as "All homeowners to whom Defendants Stonecrest and Freeman have sent a letter substantially in the form attached to the Complaint as Exhibit A." The Class definition includes owners of approximately 437 residential properties.

As set forth in more detail below, this settlement readily meets the criteria required for preliminary approval. This consumer class action brought under federal and state debt collection statutes, which are remedial in nature, has already resulted in significant practice changes by Defendants Stonecrest Managers[2] and Jon O. Freeman ("Stonecrest" or "Defendants") that will benefit consumers in the future. Further, the settlement provides economic relief to Class members in almost the maximum amount permitted by law if the Plaintiff prevailed at trial.

This settlement was reached fairly quickly, due principally to the fact that Defendants realized they had no defense on the merits of the claims. Discovery, including written interrogatories and document requests, in addition to a deposition of Defendants' operations manager, confirmed the reasonableness of the settlement.

## I.   NATURE OF THE LITIGATION

This consumer class action asserted claims for violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*. and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1, *et seq*. ("CPL"). The Complaint, filed March 13, 2012, alleged that Defendants violated these laws by delivering to consumers, who were allegedly in default on their residential mortgage, a false, deceptive and misleading form collection letter that stated, inaccurately, as follows:

> Stonecrest is the new owner of the property in which you are currently residing and they have requested this letter to be hand-delivered to your residence.
>
> In order to present you with your rental options or alternatives, please contact our Account Representative at Stonecrest using the contact number provided below:
>
> Account Representative: John Hope

---

[2]   The action as originally filed named Stonecrest Income & Opportunity Fund I, LLC as a defendant. Following completion of discovery, which demonstrated that the entity known as Stonecrest Managers was the servicer of the mortgages at issue and responsible for the letter that served as the basis for the lawsuit, the parties stipulated to substitute Stonecrest Managers as the defendant. (Doc. 18).

Toll-free phone number: 800-557-7720 ext. 212

Thank you,

Jon O. Freeman
Stonecrest Income & Opportunity Fund I, LLC

*See* Exhibit A to Complaint.

Defendants filed Answers to the Complaint on June 5, 2012. Following service of the Complaint, defense counsel contacted plaintiff counsel and settlement negotiations commenced soon thereafter. The parties participated in several pre-trial telephone conferences with the Court, during which they advised the Court of the ongoing settlement talks. Plaintiff propounded written discovery on June 29, 2012, and begin obtaining information that assisted in reaching a resolution. In a telephone conference on August 27, 2012, the parties notified the Court that they had reached an agreement in principle for settlement of the case on a class basis, subject to confirmatory discovery on several issues. The Court then entered an Order (Doc. 17) requiring that any motion for preliminary approval of the settlement be filed by December 3, 2012.

Thereafter, the Defendants produced further information in response to the discovery requests, and Plaintiff took the deposition of Defendants' operations manager, John Hope (excerpts attached hereto). Now, after six months of negotiations, the parties have agreed to a documented settlement agreement, filed simultaneously herewith as Appendix I, and now request that the Court grant preliminary approval, and schedule a hearing to consider final approval of the settlement.

## II.     ELEMENTS FOR CERTIFICATION OF A CLASS SETTLEMENT

In considering the proposed settlement, the first question for the Court is whether a settlement class may be conditionally certified for settlement purposes. *See Amchem Products,*

*Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (trial court may disregard management issues in certifying a settlement class, but the proposed class must still satisfy the other requirements of Rule 23).

Rule 23 of the Federal Rules of Civil Procedure governs the certification of class actions. One or more members of a class may sue as representative parties on behalf of a class if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The parties have reached a proposed agreement on behalf of the Settlement Class defined above in note 1. In support of their contention that proper and sufficient grounds for class certification exist under Rule 23, the parties would show the following:

### A.     Numerosity

In applying this rule, it has consistently been held that joinder is impracticable where the class is composed of hundreds of potential claimants; indeed, impracticability of joinder has often been found where the class is composed of less than 100 members. *See, e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 785-86 (3d Cir. 1985) (90 class members meets numerosity requirement); *Weiss v. York Hospital*, 745 F.2d 786, 808 (3d Cir. 1984) (92 class members meets the numerosity requirement).

Discovery has shown that owners of approximately 437 residential properties were sent the collection letter at issue here during the period from April 2011 through March 2012. While not a large class, these numbers are certainly sufficient to establish that joinder is impracticable.

**B.    Commonality**

Plaintiff also asserts that there are questions of law or fact common to the Class.  The main question is whether the collection letter violated the FDCPA.[3]

The theories of liability are precise because they arise from the same standard practice and present basic questions that are common to all Class members.    Cases presenting standardized practices directed at consumers invariably present common predominating issues. *See Perry v. FleetBoston Financial Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005) (finding Rule 23 requirements met in consumer class action and noting cases routinely certified where 'defendants have engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents.'" (citing cases). *See also Weiss v. Regal*

---

[3]    The Complaint alleges many violations stemming from the letter:

"Defendants' violations include, but are not limited to, violations of sections 1692e, 1692f and 1692g of the FDCPA, as evidenced by the following conduct:

(a)    using false, deceptive or misleading representations or means in connection with the collection of debt, in violation of section 1692e;

(b)    falsely representing the character, amount or legal status of the debt, in violation of section 1692e(2);

(c)    threatening to take action that cannot legally be taken or that is not intended to be taken, in violation of section 1692e(5);

(d)    using a false representation or deceptive means to collect or attempt to collect a debt, in violation of section 1692e(10);

(e)    failing to disclose in the initial communication with the consumer that the debt collector is attempting to collect a debt and that information will be used for that purpose, in violation of section 1692e(11);

(f)    using unfair or unconscionable means to attempt to collect a debt, in violation of section 1692f;

(g)    attempting to collect an amount not expressly authorized by the agreement creating the debt or permitted by law, in violation of section 1692f(1);

(h)    taking or threatening to take nonjudicial action to effect dispossession of property, in violation of section 1692f(6);

(i)    failing to comply with the requirements of section 1692g; and,

(j)    otherwise using false, deceptive, misleading and unfair or unconscionable means to collect or attempt to collect an alleged debt from the Plaintiff."
Complaint, ¶ 31.

*Collections*, 385 F.3d 337, 344-45 (3d Cir. 2004) (claims arising from statements contained in standard collection communications particularly appropriate for class action).

Inasmuch as the Defendants' form collection letter was essentially uniform with regard to these issues, commonality is satisfied. Indeed, a single common question is sufficient enough to satisfy the requirements of Rule 23(a)(2). *See, e.g., Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Where, as here, the defendant engaged in standardized conduct toward putative class members, commonality is satisfied. *In re Prudential Insurance Company America Sales Practice Litigation*, 148 F.3d 283, 310 (3d Cir. 1998).

### C.    Typicality

This requirement is "designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Prudential*, 148 F.3d at 311. The threshold for establishing typicality is low. Typicality does not require that the claims of the class members be identical. *Eisenberg v. Gagnon*, 766 F.2d at 786. Rather, a plaintiff's claims are typical when the nature of the plaintiff's claims, judged from both a factual and a legal perspective, are such that in litigating her personal claims she can reasonably be expected to advance the interests of absent class members. *See, e.g., General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 156-157 (1982).

Plaintiff received the form collection letter, has the same interest in resolution of the issues as all other members of the Class and her claims are typical of all members of the Class. These facts, and Plaintiff's claims, are therefore typical of the facts and claims of all other members of the proposed Settlement Class. *See Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1998).

### D.     Adequacy of Representation

A representative plaintiff must be able to provide fair and adequate protection for the interests of the class. That protection involves two factors: (a) the representative plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the representative plaintiff must not have interests antagonistic to those of the Class. *See, e.g., In re Prudential*, 148 F.3d at 312; *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982).

Plaintiff fairly and adequately represents the interests of the Class. She has retained qualified and experienced attorneys to represent her in this matter. The attorneys have substantial experience in class action and consumer litigation and are qualified to conduct the litigation. As a nearby court recently held in ruling on a contested motion for class certification, *Summerfield v. Equifax Information Services, LLC*, 264 F.R.D. 133, 141 (D.N.J. 2009), the undersigned counsel "is indeed 'qualified, experienced, and generally able to conduct' this litigation." A more recent decision from the District of Maine held the same. *LaRocque v. TRS Recovery Services, Inc.*, 2012 WL 2921191 (D. Me. July 17, 2012). *See also Perry, supra* (court finding that "I and a number of my colleagues have previously found that class counsel Francis & Mailman, P.C. and Donovan Searles LLC, possesses the skill, experience and qualifications necessary to conduct litigation similar to the present lawsuit. *Oslan v. Collection Bureau of Hudson Valley*, 206 F.R.D. 109, 112 (E.D. Pa. 2002); *see also, e.g., Orloff v. Syndicated Office Systems, Inc.*, 2004 WL 870691, *4 (E.D. Pa 2004) (Surrick, J.); *Bonett v. Education Debt Services, Inc.*, 2003 WL 21658267, *3 (E.D. Pa. 2003) (Davis, J.); *Saunders v. Berks Credit &*

*Collections*, 2002 WL 1497374, *8 (E.D. Pa. 2002) (DuBois, J.)).'' 229 F.R.D. at 112-13. [4]

Moreover, Plaintiff has no interests that are antagonistic to the interests of the Class, and is unaware of any actual or apparent conflicts of interest between her and the Class.

### E.    Rule 23(b)(3) Considerations

The proposed settlement contemplates a class certification permitting opt-outs pursuant to Rule 23(b)(3). An action may be maintained as a class action if the four elements described above are satisfied, and in addition, the conditions under Rule 23(b)(3) are met requiring that

> the Court finds that the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and that a Class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). The requirement that the questions of law or fact common to all

---

[4]    *See also Barel v. Bank of America*, 2009 WL 122805 (E.D. Pa. Jan. 16, 2009) (Surrick, J.); *Markocki v. Old Republic National Title Ins. Co.*, 2008 WL 5159252 (E.D. Pa. Dec. 9, 2008) (Tucker, J.); *Strausser v. ACB Receivables Management, Inc.*, 2008 WL 859224 (E.D. Pa. Mar. 28, 2008) (O'Neill, J.); *Allen v. Holiday Universal, Inc.*, 249 F.R.D. 166 (E.D. Pa. 2008);  (Pratter, J.); *Cohen v. Chicago Title Ins. Co.*, 242 F.R.D. 295 (E.D. Pa. 2007) (Sánchez, J.); *Jordan v. Commonwealth Financial Systems, Inc.*, 237 F.R.D. 132 (E.D. Pa. 2006) (Davis, J.); *Braun v. Wal-Mart Stores, Inc.*, 2005 WL 3623389 (Pa.Com.Pl. Dec. 27, 2005); *Beck v. Maximus, Inc.*, 2005 WL 589749 (E.D. Pa. March 11, 2005); *Stoner v. CBA Information Services*, 352 F.Supp.2d 549 (E.D. Pa. 2005); *Orloff v. Syndicated Office Systems, Inc.*, 2004 WL 870691 (E.D. Pa. April 22, 2004);  *Petrolito v. Arrow Financial Services, LLC*, 221 F.R.D. 303 (D. Conn. 2004); *Gaumer v. The Bon-Ton Stores*, C.A. No. 02-8611 (E.D. Pa. Dec. 30, 2003) (Yohn, J.); *Wells v. Coldata, Inc.*, C.A. No. 02-6609 (E.D. Pa. Nov. 20, 2003) (Brody, J.); *Muse v. Dymacol, Inc.*, 2003 WL 22794698 (E.D. Pa. Nov. 7, 2003) (Savage, J.); *Street v. Portfolio Recovery Associates*, C.A. No. 01-3684 (E.D. Pa. July 30, 2003) (Tucker, J.); *Piper v. Portnoff Law Associates, Ltd.*, 215 F.R.D. 495 (E.D. Pa. 2003) (Katz J.); *Oslan v. Law Offices of Mitchell N. Kay*, 232 F. Supp. 2d 436 (E.D. Pa. 2002) (Katz, J.); *Samuel-Bassett v. Kia Motors America, Inc.*, 212 F.R.D. 271 (E.D. Pa. 2002) (Joyner, J.) (class certified for breach of warranty claims), *vacated on other grounds*, 357 F.3d 392 (3d Cir. 2004); *Schilling v. Let's Talk Cellular and Wireless, Inc.*, 2002 WL 391695 (E.D. Pa. Feb. 6, 2002) (Robreno, J.); *Colbert v. Dymacol, Inc.*, 2001 WL 34083813 (E.D. Pa. Oct. 2, 2001) (Newcomer, J.) (striking offer of judgment and granting motion for class certification), *appeal dismissed as improvidently granted*, 344 F.3d 334 (3d Cir. 2003) (unanimous *en banc* decision); *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461 (E.D. Pa. 2000) (Robreno, J.); *Smith v. First Union Mortgage Corp.*, 1999 WL 947398 (E.D. Pa. Aug. 23, 1999) (Waldman, J.); *Williams v. Empire Funding Corp.*, 183 F.R.D. 428, 440 (E.D. Pa. 1998) (Robreno, J.) (class certified for rescission claims under Truth in Lending Act).

members of the Class predominate over questions pertaining to individual members is normally satisfied where plaintiffs have alleged a common course of conduct on the part of the defendant. *Prudential*, 148 F.3d at 314-315.

Plaintiff has alleged such a common course of conduct by the Defendants. Class members were all sent the same collection letter. The predominating, indeed the dispositive, issue is whether Defendants violated the FDCPA by the use of such letter.

A class action in this case is superior to other available methods for the fair and efficient adjudication of the controversy because a class resolution of the issues described above outweighs the difficulties in management of separate and individual claims and allows access to the courts for those who might not gain such access standing alone, particularly in light of the relatively small amount of the actual and statutory damage claims that would be available to individuals. In numerous cases, courts have recognized that Rule 23(b)(3) certification is particularly appropriate for consumer claims such as those asserted here. *See, e.g., Amchem*, 521 U.S. at 617 ("The policy of the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"). Moreover, such a certification permits individual claimants to opt-out and pursue their own actions separately if they believe they can recover more in an individual suit. Thus, both predominance and superiority are satisfied.

Solely for the purposes of settlement, Defendants do not dispute that the Class should be certified in accordance with Rule 23(b)(3). Accordingly, the Court should conditionally certify the Class for settlement purposes.

## III.   NATURE OF SETTLEMENT

Representative Plaintiff Mott and Defendants have agreed, subject to this Court's approval, to a settlement of this litigation on a class-wide basis. The terms of the settlement are set out in the Settlement Agreement filed simultaneously herewith as Appendix I. The settlement is fair, reasonable and sound in light of the relevant facts, the applicable law, and the benefits conferred by the settlement to the Class.

### A. **The Settlement Class**

The Settlement Class is defined as:

> All homeowners to whom Defendants Stonecrest and Freeman have sent a letter substantially in the form attached to the Complaint as Exhibit A.

Appendix I, at ¶ 1. As stated above, there are approximately 437 consumers who were sent the form letter during the year before the Complaint was filed and Stonecrest stopped using that practice upon being served with this lawsuit.

### B. **Settlement Benefits**

The Settlement Agreement involves both equitable and compensatory relief. The Settlement Agreement confirms that Stonecrest ceased using the letter at issue and agrees to refrain from such practice in the future. *See* App. I, at ¶ 5. The Settlement Agreement also provides for a payment of $30,000 into a Settlement Fund for distribution to members of the Settlement Class, or approximately $68.64 each. The Settlement Fund amount is very close to the maximum amount the class could have been awarded under the statute had the case gone to trial. *See* 15 U.S.C. § 1692k(a)(2)(B)(ii), limiting statutory damages in class actions to one percent of defendant's net worth.

### C. **Costs of Notice**

- 10 -

The parties have agreed that Defendants will pay all costs associated with the notice program set forth in the Settlement Agreement. *See id.* at 6.

### D. **Service Award for Class Representative**

Subject to court approval, the parties have agreed that the representative Plaintiff will be paid an award of $3,250 by the Defendants, and to which the Defendants will not object, for her services in connection with representing the Class.

### E. **Attorneys' Fees and Costs**

Separate and apart from the Settlement Fund, Defendants shall also pay Plaintiff's reasonable attorneys' fees and expenses, in an amount to be determined by the Court, upon motion filed not later than ten (10) days prior to the final approval hearing. Stonecrest may oppose Plaintiff's request for such fees and expenses, and retains the discretion to appeal any such award. The Settlement Agreement provides that Defendants shall pay to Class Counsel, Francis & Mailman, P.C., the amount approved by the Court for an award of attorney's fees and costs, within ten (10) days after the Effective Date. *Id.* at 4.

### F. **Class Notice**

The settlement provides for the hiring of an independent, third-party settlement administrator, First Class, Inc., to administer the settlement and effectuate the compiling and mailing of the Class Notice. This entails the compiling of a list of all members of the Settlement Class, which Defendants have compiled from their account records. Defendants shall provide the class list to the Settlement Administrator in readable electronic form for purposes of sending the Class Notices. *Id.* at ¶ 4(c). The proposed Class Notice, attached as Exhibit B to Appendix I, is clear and provides Settlement Class members with adequate information to make an informed decision as to whether they should remain in the Class, opt out, or object to any part of the

proposed settlement. *Id.* at Ex. B.  Once the class list is compiled, the Settlement Agreement requires that Defendants cause the Settlement Administrator to send the Class Notice by first-class mail.  If a notice is returned as undeliverable, the Settlement Administrator will perform a skip-trace to update the member's mailing address. *Id.* at 7.

### G. Release

Upon final approval of the settlement, the Defendants will be released from all claims for statutory damages asserted in the Complaint under the FDCPA. *Id.* at ¶6.  Members' claims for actual damages, if any, are specifically excluded from the release. *Id.* at ¶ 8.

## IV.   ARGUMENT

### A. Standards for Preliminary Approval Of A Class Settlement

When a proposed class-wide settlement is reached, it must be submitted to the Court for approval.  H. Newberg & A. Conte, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2009) ("NEWBERG").  Preliminary approval is the first of essentially three steps that comprise the approval procedure for settlement of a class action.  The second step is the dissemination of notice of the settlement to all Class members.  The third step is a settlement approval or final fairness hearing. *See* MANUAL FOR COMPLEX LITIGATION 4TH, § 21.63 (2004), *available at* http://www.fjc.gov ("MANUAL").  While a settlement class must satisfy each of the requirements of Rule 23(a) and Rule 23(b)(3), "the fact of settlement is relevant to a determination of whether the proposed Class meets the requirement imposed by the Rule." *In re: Prudential Ins. Co. of America Sales Litigation*, 148 F.3d at 308-09.

The question presented on a motion for preliminary approval of a proposed class action settlement is whether the proposed settlement appears fair and reasonable.  MANUAL at § 21.62; There is an initial presumption of fairness when a proposed settlement, which was negotiated at

arm's length by counsel for the Class, is presented for court approval. NEWBERG, § 11.41. *See also In re General Motors Corp.*, 55 F.3d at 784 ("The . . . high judicial favor for negotiated settlements of litigation is particularly keen in class actions . . . where substantial judicial resources can be conserved by avoiding formal litigation.")

The approval of a proposed settlement of a class action is a matter within the broad discretion of the trial court. Preliminary approval does not require the trial court to affirmatively answer the ultimate question of whether a proposed settlement is fair, reasonable and adequate. That determination is made only after notice of the settlement has been given to the members of the class and after they have been given an opportunity to voice their views of the settlement or be excluded from the class. *See Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).

The question of whether a proposed settlement is fair, reasonable and adequate necessarily requires a judgment and evaluation by the attorneys for the parties based upon a comparison of "the terms of the compromise with the likely rewards of litigation." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *Collier v. Montgomery County*, 192 F.R.D. 176, 184 (E.D. Pa. 2000) (citing factors established in *Girsh*). Therefore, many courts recognize that the opinion of experienced counsel supporting the settlement is entitled to considerable weight. *See Collier*, 192 F.R.D. at 186.

In addition to being substantively reasonable in relation to the risks and likely rewards of litigation, the proposed settlement must be "the result of good faith, arms length negotiations." *Collier*, 192 F.R.D. at 184. In evaluating this requirement, courts proceed as follows:

> If the proposed settlement appears to be the product of serious informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to Class Representatives or segments of the Class, and falls within the range of possible approval, then the court should direct that notice be

> given to the Class Members of a formal fairness hearing, at which evidence may
> be presented in support of and in opposition to the settlement.

*Id.* A finding that these factors are present establishes an initial presumption of fairness. *Id.*; *see also General Motors*, 55 F.3d at 785-86. Here, the proposed settlement easily meets these standards.

### B. The Terms of the Proposed Settlement are Fair, Reasonable and Adequate

The proposed settlement is reasonable when considered in light of the cognizable damages that members would otherwise have been permitted to recover if successful under the FDCPA. These factors demonstrate that the proposed settlement is an excellent result for the Class.

Plaintiff has achieved a cash benefit for the Class in the amount of $30,000. Under section 1692k(a)(2)(B)(ii) of the FDCPA, the most Plaintiff could have won at trial would be one percent of the Defendants' net worth. Here, financial documents and deposition testimony showed that Stonecrest's net worth was approximately $1,743,035 and Defendant Freeman's approximately $1,500,000. Hope Dep. at Ex. 10 and pp. 55, 59, 61. Taken together, one percent of the combined net worths is $32,430, or slightly more than the settlement payment agreed to be paid to the Class.

So this is a very good result. It is by no means certain that both Defendants would have been found liable for the FDCPA violations asserted. Deposition testimony was that Mr. Freeman did not sign the collection letter and that he had no knowledge such a letter was even being used. Hope Dep. at pp. 31-33.

Moreover, Defendants would undoubtedly try to argue at trial that only one defendant debt collector's net worth would be part of the statutory damages calculus because there was

- 14 -

only one letter violation.[5]  Not only that, Defendants might try to get some mileage out of arguing the factors set forth in the statute that a court may use in determining the amount of statutory damages to assess.[6]  So it is also by no means certain, notwithstanding the egregiousness of the letter at issue, that Plaintiff would have achieved the maximum statutory damages award from this Court, even after proving liability.

The proposed settlement avoids those risks.  The settlement is the product of serious, informed and non-collusive negotiations.  The settlement has no "obvious deficiencies" and falls well within the range for approval.  Moreover, and just as important in counsel's estimation, this action and the settlement have resulted in Defendants' cessation of the allegedly unlawful practice, and essentially achieves a settlement injunction.  As such, the settlement provides a societal benefit as well.

As noted, settlements of class action disputes are favored in the law, to bring finality and to conserve judicial resources.  *General Motors*, 55 F.3d at 783.  Settlement of consumer class actions otherwise involving individual claims for small sums, such as the instant action under the FDCPA, are particularly well suited to class settlement.

The settlement does not improperly grant preferential treatment to the Class Representative[7] or segments of the Class.  The relief provided in the settlement will benefit all

---

[5]     *But see* section 1692k(a) ("... *any* debt collector who fails to comply with *any* provision of this subchapter with respect to *any* person is liable to such person....") (emphasis added).

[6]     "In determining the amount of liability in any action under subsection (a) of this section, the court shall consider, among other relevant factors – (2) in any class action ..., the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional." 15 U.S.C. § 1692k(b)(2).

[7]     The FDCPA specifically provides that a class representative may recover more than members of the class she represents.  *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 472 (E.D. Pa. 2000).

Class members equally. The amount payable to the Representative Plaintiff is reasonable in that she has participated in the litigation of this action, and rendered substantial services on behalf of absent Class members. *See Barel v. Bank of America*, 2009 WL 122805, *12 (E.D. Pa. Jan. 16, 2009) (awarding class representative $10,000). *See also Perry v. FleetBoston Financial Corp.*, 229 F.R.D.105 (E.D. Pa. 2005) (awarding $5,000 each to three representative plaintiffs in class settlement); *Bonett v. Education Debt Services, Inc.*, 2003 WL 21658267, *7 (E.D. Pa. May 9, 2003) (awarding $4,000 to class representative in class settlement, citing cases).

At the hearing on final approval, movant anticipates a final judgment giving effect to the Settlement Agreement and dismissing without prejudice all claims of any purported Settlement Class members who have been excluded from the Settlement Class. Upon final approval and performance by Defendants of all of their obligations under the Settlement Agreement, Defendants will be fully, finally and completely released of all liability for statutory damages to the Class.

## V.    CONCLUSION

Accordingly, Plaintiff Loleta M. Mott requests that the Court grant preliminary approval of the class action settlement, as set forth in the proposed Order of Preliminary Approval.

Dated: November 27, 2012                    Respectfully submitted,

*s/ David A. Searles*
James A. Francis
David A. Searles
FRANCIS & MAILMAN, P.C.
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA  19110

Attorneys for Loleta M. Mott and Settlement Class

- 16 -



## Compressed Transcript of the Testimony of
## **JOHN HOPE, 10/26/12**

# ORIGINAL

**Case:** Mott v. Stonecrest Income & Opportunity Fund I, LLC, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Case 2:12-cv-01292-LS   Document 19   Filed 11/27/12   Page 24 of 34

Mott v. Stonecrest Income & Opportunity Fund I, LLC, et al.                                    JOHN HOPE, 10/26/12

## Page 1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LOLETA MOTT, on behalf of  )
herself and all other      )
similarly situated,        )
                           )Civil Action No. 12-1292
Plaintiff,                 )
                           )
        vs.                )
                           )
STONECREST INCOME &        )
OPPORTUNITY FUND I, LLC, and)
JON FREEMAN,               )
                           )
        Defendants.    )
_____)

Videotaped deposition of JOHN HOPE, taken
at Pacific Business Center, 19925 Stevens Creek
Boulevard, Cupertino, California, on Friday,
October 26, 2012, beginning at 10:14 a.m., before
Charlotte A. Mathias, Certified Shorthand Reporter,
in and for the State of California.

* * *

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

## Page 2

```
 1              APPEARANCES
 2  For the Plaintiff (via video teleconferencing):
 3     FRANCIS & MAILMAN, P.C.
       BY: DAVID SEARLES, ESQUIRE
 4     100 South Broad Street, 19th Floor
       Philadelphia, Pennsylvania 19110
 5     (215) 735-8600
 6
 7
 8  For the Defendants (via video teleconferencing):
 9     FINEMAN, KREKSTEIN & HARRIS
       BY: RICHARD J. PERR, ESQUIRE
10     1735 Market Street, Suite 600
       Philadelphia, Pennsylvania 19103
       (215) 893-9300
11
12
13  Also Present:
14     Aric Kerhoulas, videographer
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                    INDEX
 2                                Pages
 3  WITNESS: JOHN HOPE
 4  QUESTION BY:
 5     By Mr. Searles ...................6
 6  Certificate of Reporter ............68
 7
 8              EXHIBITS
                              MARKED
 9  NUMBER    DESCRIPTION          FOR ID
10  EXHIBIT 1  5-Page Defendants' Responses to .........4
              Plaintiff's First Set of
11            Interrogatories
12  EXHIBIT 2  4-Page Corporate Assignment of ..........4
              Mortgage - Deed of Trust
13
            EXHIBIT 3  1-Page Letter from Home Servcing to .....4
14            Loleta Mott Dated 02/11/2010
15  EXHIBIT 4  1-Page Letter from Home Servicing to ....4
              Loleta Mott Dated 10/07/2011
16
            EXHIBIT 5  1-Page Dear Occupant Letter from ........4
17            Stonecrest Dated 11/15/2011
18  EXHIBIT 6  3-Page Letter From Weltman Weinberg & ...5
              Reis to Loleta Mott Dated 3/12/2012
19
            EXHIBIT 7  1-Page NLC Servicing Payoff Statement ...5
20            Dated 08/13/2012
21  EXHIBIT 8  6-Page Collection History ...............5
22  EXHIBIT 9  14-Page Class List .....................5
23  EXHIBIT 10 3-Page Balance Sheet - Stonecrest .......5
24  EXHIBIT 11 55-Page 2011 S-Corp Tax Return dtd ......5
              04/03/2012
25
```

## Page 4

```
 1          BE IT REMEMBERED that on Friday, the 26th
 2  day of October, 2012, commencing at the hour of
 3  10:14 a.m., at Pacific Business Center, 19925 Stevens
 4  Creek Boulevard, Cupertino, California, before me,
 5  Charlotte A. Mathias, a Certified Shorthand Reporter
 6  in and for the State of California, personally
 7  appeared
 8               * * *
 9          JOHN HOPE,
10  Having been first duly sworn, was
    examined and testified as follows:
11               * * *
12
13  (Exhibit 1, 5-Page Defendants' Responses
    to Plaintiff's First Set of
14  Interrogatories, was marked for
    identification.)
15
16  (Exhibit 2, 4-Page Corporate Assignment
    of Mortgage - Deed of Trust, was
17  marked for identification.)
18  (Exhibit 3, 1-Page Letter from Home
    Servcing to Loleta Mott Dated
19  02/11/2010, was marked for
    identification.)
20
    (Exhibit 4, 1-Page Letter from Home
21  Servicing to Loleta Mott Dated
    10/07/2011, was marked for
22  identification.)
23  (Exhibit 5, 1-Page Dear Occupant Letter
    from Stonecrest Dated 11/15/2011, was
24  marked for identification.)
25
```

Page 29

1  to that mortgage and the payments that are due under
2  that mortgage?
3      A.  Well, our intent, primarily, is to reach
4  out and try to find a -- I mean, it sounds cliche,
5  but it's a win-win resolution for everyone.  You
6  know, a lot of what is in the industry, there are
7  severely delinquent mortgages.  I mean, you know, you
8  guys are familiar with what -- what's happened.  And,
9  you know, if we can turn it into a positive all the
10  way around, that's our goal.  We --
11     Q.  So, what step -- I'm sorry.  I didn't mean
12  to interrupt.  Is there anything else?
13     A.  No.
14     Q.  What concrete steps does Stonecrest follow
15  to achieve that goal upon acquisition of a mortgage?
16     A.  The servicing transfer happens and provides
17  us with generally phone numbers that are fairly
18  accurate.  And we try to reach out, ask individuals
19  what their plans are, what can you do, you know.  In
20  the case of Ms. Mott, I think she was over four years
21  behind and -- and we were like, you know, you've
22  been -- you know, what is -- what is your plan?
23  Where -- where can we go from here?
24     Q.  Does Stonecrest consider itself a debt
25  collector within the meaning of the Fair Debt

Page 30

1  Collection Practices Act, as it pursues these steps?
2      A.  At the time, no.
3      Q.  What time?
4      A.  At the -- at the time we were dealing with
5  Ms. Mott.
6      Q.  And that would have been when it acquired
7  her mortgage in October of 2011?
8      A.  Yes.
9      Q.  Has the practice changed since then?
10     A.  Yes.
11     Q.  When did it change?
12     A.  When we realized that we -- we were under
13  the -- wrongly so, as advised, we were under the
14  impression that we weren't, but after doing further
15  research, we realized that because we were acquiring
16  delinquent debt, we -- we were.  And so we've
17  resulted and done quite a few changes since then.
18     Q.  Do you remember when those changes took
19  place, or when the process to change began, I should
20  say?
21     A.  Shortly after you contacted us.
22     Q.  Oh, the filing of the lawsuit?
23     A.  Yes.  We did -- we -- it was -- it was --
24  it was our mistake and we went, "Oh, that was not" --
25  we -- we didn't realize.

Page 31

1      Q.  Okay.  Now, let's look at document
2  Number 5.  Do you have that?
3      A.  Yes.
4      Q.  This appears to be -- to be a form letter
5  addressed to Occupant?
6      A.  Yes.
7      Q.  Is that a correct description?
8      A.  Yes.
9      Q.  And was this letter used around that time
10  as a means of collecting delinquent payments?
11     A.  It was a letter used for the real estate
12  owned end of the business.
13     Q.  Did you have anything do with the writing
14  of this form letter?
15     A.  No.  It was in existence when I came on
16  board.
17     Q.  I -- I'm noticing that there's no
18  address -- the name or address of anyone on here,
19  just "Dear Occupant."  How would this letter be
20  transmitted to the person you wanted to get it to?
21     A.  Hand delivered through a vendor that goes
22  to our properties.
23     Q.  Is the letter still being used?
24     A.  No.
25     Q.  Now, Mr. Freeman's name appears on the

Page 32

1  letter --
2      A.  Yes.
3      Q.  -- correct?  Did he sign these letters as a
4  matter of course?
5      A.  He never signed them.
6      Q.  Do you know why his name shows up there?
7      A.  No.
8      Q.  That is -- the letter was in that form when
9  you first started work at Stonecrest; right?
10     A.  I -- I believe a -- it was drafted and I
11  don't really think that he or I knew that either one
12  of our names were on the letter.  And I think it
13  was -- again, a letter -- this letter was used for
14  foreclosed properties that we already owned.
15     Q.  I see.
16     A.  It was not really -- you know, it was a --
17  that was its sole purpose.
18     Q.  The purpose was for properties that you
19  believed you had ownership of already --
20     A.  Yes.
21     Q.  -- correct?  If -- if your name shouldn't
22  have been there or Mr. Freeman's name shouldn't have
23  been there, what name, if any, should have been on
24  the letter?
25     A.  Probably none.

8  (Pages 29 to 32)

Page 33

1    Q.   Before the letter is delivered to the
2  address, are there any -- and I'm talking about
3  during this time frame, in the late 2011, were there
4  any other steps taken as a matter of procedure prior
5  to this letter going out?
6    A.   I can't remember.  I don't think so.
7    Q.   So this would be the -- and I'm not trying
8  to put words in your mouth.  I'm just trying to
9  understand the process.  This would be the first
10 written communication delivered to the property?
11   A.   This letter was not intended to be used for
12 that.  It was sent in error.
13   Q.   It was not intended to be used for what?
14   A.   For -- for the collection of delinquent
15 notes and mortgages.  It was a letter that was used
16 for people who were squatting in foreclosed
17 properties.
18   Q.   So, if the intent had been to collect
19 payments, you would have sent a different kind of
20 letter?
21   A.   Yes.
22   Q.   And --
23   A.   This went out in -- it was ill-crafted and
24 went out in error.
25   Q.   I want to -- just to follow it up a little

Page 34

1  bit, I want to jump up ahead to a document that's
2  been marked Number 8.  Do you have that in front of
3  you?
4    A.   Yes, I do.
5    Q.   And do you recognize it?
6    A.   Yes, I do.
7    Q.   What is it?
8    A.   It is the collection notes from our
9  collection system for Loleta Mott.
10   Q.   Just so I understand the document, because
11 the form I got it in, I think it's sort of truncated.
12 This is like a copy of a spreadsheet and the first
13 two pages should be like the left side of the
14 spreadsheet and the next two pages should be the
15 right side?
16   A.   Yes.  Yes.
17   Q.   Okay.  All right.  So, just, you know,
18 going across one of the lines, can you tell me what
19 the information is communicating?  Could you just
20 pick a line just so I can -- well, maybe -- let me
21 leave it on you.  The first column would be the
22 number of the loan; right?
23   A.   Correct.
24   Q.   And the "memo ID" column is -- is what?
25   A.   Who's performing the function on it.

Page 35

1    Q.   You mean the employer --
2    A.   Yeah.
3    Q.   -- the employee at Stonecrest who is doing?
4    A.   Yeah.
5    Q.   Oh, and that's -- so, like Number 1 would
6  be someone named J. Young?
7    A.   Yes.
8    Q.   And then the column that says, "memo create
9  DT"?
10   A.   Date.
11   Q.   What does that mean?
12   A.   That's the memo -- the date the memo was
13 created.
14   Q.   The date that the notes were entered?
15   A.   Um-hmm.
16   Q.   Correct?
17   A.   Um-hmm.
18   Q.   And then the -- the other column is "memo
19 subject."  What -- what's that mean?
20   A.   That means -- that is the subject of what
21 is trying to take place.
22   Q.   And then the last column is "memo text."
23 What's that?
24   A.   Kind of what was communicated between us
25 and the borrower or what's transpiring between us and

Page 36

1  other entities.
2    Q.   All right.  If you look at the first page,
3  about halfway down, under "memo subject"?
4    A.   Um-hmm.
5    Q.   It says, "Document tax decision worksheet"?
6    A.   Yes.
7    Q.   What -- what does -- what does that mean?
8  What's a tax decision worksheet?
9    A.   So, with a lot of these mortgages that
10 haven't paid in quite a while, property taxes are a
11 real issue.  So, we have a -- a service and/or
12 individuals within our company who will call the
13 county and who will determine what the taxes are owed
14 on the property.  And that becomes a tax decision
15 worksheet.  And then we decide to pay the taxes or
16 not pay the taxes -- property taxes.
17   Q.   Okay.  I see.  So the memo text that
18 followed that particular memo subject would explain
19 what the decision was or -- or --
20   A.   If there was one.
21   Q.   All right.  Going down a little further, it
22 says "Document SIOF transferred to NLC."  What does
23 that mean?  And this took place it looks on
24 March 13th of 2012?
25   A.   That looks like a transfer of servicing.

Case 2:12-cv-01292-LS   Document 19   Filed 11/27/12   Page 27 of 34
Mott v. Stonecrest Income & Opportunity Fund I, LLC, et al.
JOHN HOPE, 10/26/12

Page 53

1    A.  No, but I can get them.
2    Q.  That wouldn't be difficult?
3    A.  Not at all.
4    Q.  And if -- if -- again, if you look at what
5    would be the far right page, if there were a
6    spreadsheet in its original form --
7    A.  Um-hmm.
8    Q.  -- after the column that says, "state,"
9    there is a column that says, "Xfer Dt."
10   A.  Yes.
11   Q.  What's that mean?
12   A.  Transfer date.
13   Q.  You mean the date of acquisition?
14   A.  Yes.
15   Q.  That's when Stonecrest acquired the
16   property --
17   A.  Um-hmm.
18   Q.  -- mortgage?  And then, the last column,
19   "O," I guess, would mean that someone determined that
20   the property was occupied or -- or not?
21   A.  Correct.
22   Q.  Okay.  Whatever time they looked at them.
23   Okay.  Does the name Mary Barrett mean anything to
24   you?
25   A.  No.

Page 54

1    Q.  Well, she's on the list.  I was asking you
2    before about lawsuits.  And you said you wouldn't
3    necessarily know.  Do you have any knowledge of a
4    lawsuit Mary Barrett has brought against Stonecrest?
5    A.  No, I do not.
6    Q.  In Georgia?  Northern District of Georgia?
7    A.  No.
8    Q.  Who would know about that, if not you?
9    Mr. Freeman?
10   A.  I doubt he would know too.  It doesn't --
11   Q.  Somebody better know.  Okay.  Moving on to
12   document Number 10.  Have you seen this document
13   before?
14   A.  Yes.
15   Q.  Did you have any role in compiling this
16   document?
17   A.  No.
18   Q.  When did you first see it?
19   A.  When it was prepared.  Or -- or when it --
20   when it was delivered to Richard.
21   Q.  You're referring to your counsel; right?
22   A.  Yes.
23   Q.  It looks like it was prepared, if you look
24   at the lower bottom left, April 25 or April 24th of
25   2012; is that right?

Page 55

1    A.  That's -- yeah, that's what it says.
2    Q.  That's what it says?
3    A.  Yes.
4    Q.  Do you know what the net worth is of
5    Stonecrest Income and Opportunity Fund?
6    A.  Judging by this balance sheet?  Is that --
7    is that your question?  Judging from the figures on
8    the balance sheet?
9    Q.  Well, to be clear, it appears this balance
10   sheet refers to Stonecrest Managers in the top right.
11   I was asking about Income and Opportunity?
12   A.  I do not know.
13   Q.  Do you have any knowledge of what
14   Stonecrest Managers' net worth would be other than
15   what appears in document Number 10?
16   A.  No.
17   Q.  If you look at -- I'm on the first page.
18   It says, "Balance sheet," top left?
19   A.  Um-hmm.
20   Q.  The third category says, "Other
21   receivables," and the first category under that says,
22   "Allowance for doubtful accounts," and it's a minus
23   figure.  Do you know what that means?
24   A.  No.
25   Q.  How about the next one?  It says,

Page 56

1    "Management fee receivable: PCF"?
2    A.  I do not know what that means.
3    Q.  Would PCF be one of the entities you
4    described earlier, Private Capital --
5    A.  Private Capital Fund, yes.
6    Q.  Do you know -- do you have any
7    understanding of whether PCF owes a management fee to
8    Stonecrest Managers?
9    A.  I would -- judging by this, I would believe
10   that they -- they probably do.
11   Q.  The next line down, "Management fee
12   receivable: CCIF."  Do you know what CCIF is?
13   A.  To the best of my knowledge, I would think
14   that would be an additional fund.
15   Q.  You don't know the name?
16   A.  I'm not -- I'm not related -- yeah, I'm
17   not --
18   Q.  Okay.  Going down to the category that
19   says, "Other assets."  Do you see that?
20   A.  Total --
21   Q.  On the left-hand side?
22   A.  Oh, okay.  There we go.  Yes.
23   Q.  And the first entry is, "Private Capital,
24   LLC.  Member invest."  Do you know what that means?
25   A.  I do not.

14  (Pages 53 to 56)

Page 57

1    Q.  And the line underneath that, where it
2  says, "Interco - receivable."
3    A.  I do not know what that is.
4    Q.  What interco refers to?
5    A.  Huh-uh.
6    Q.  If you go to the next page, which is
7  entitled "Income statement" at the top left.  Do you
8  see that?
9    A.  Um-hmm.
10    Q.  First category -- I'm sorry.  Second
11  category is called, "Expenses"?
12    A.  Yes.
13    Q.  And the -- the second personnel expense is
14  "Underwriting commission"?
15    A.  Um-hmm.
16    Q.  Do you see that?
17    A.  Yes.
18    Q.  Do you know what "underwriting commission"
19  refers to?
20    A.  I do not.  I do know that when we do
21  diligence, occasionally we pay outside firms to do
22  it.  Or -- or not outside firms -- outside
23  individuals.  Due delinquent is the review of things
24  before they get purchased.
25    Q.  So it's possible this could refer to that

Page 58

1  due diligence being done by an outside --
2    A.  I don't -- I don't --
3    Q.  -- contractor?
4    A.  I don't know.  Could be.
5    Q.  Further down, there's a reference to
6  salaries?
7    A.  Um-hmm.
8    Q.  Is it your understanding this is the
9  combined salaries of the 15 to 20 employees you were
10  referring to earlier?  Yeah, 15 to 20?
11    A.  Yes, I believe it is.
12    Q.  Further down, the category that says,
13  "Professional fees" and it refers to "consulting"
14  underneath that.  Do you know to whom the consulting
15  fees were paid?
16    A.  I do not.
17    Q.  And then there's a category of "Outside
18  services."  Do you know what goes into those -- what
19  are -- fit within that description of outside
20  services?
21    A.  As a guess, I would think it would be the
22  appraisal process and other things of that nature
23  would be -- I think that would probably be where that
24  catchall would be.
25    Outside services could be property

Page 59

1  preservation.  We do that for REOs.  You know, we
2  have to winterize in certain states if properties are
3  vacant.  So we have a vendor that goes out and
4  winterizes properties for us, makes sure the roof
5  isn't leaking, drains the pipes, puts antifreeze in
6  the pipes.  That can be quite expensive.
7    Q.  Do you have any knowledge of Mr. Freeman's
8  net worth?
9    A.  To a degree, with conversations with him,
10  yes.
11    Q.  Can you explain to me what your
12  understanding is?
13    A.  My understanding is it is between a million
14  four and a million six.
15    Q.  Is that based on any anything other than a
16  conversation, such as in documents or tax returns or
17  financial statements?
18    A.  Just -- no, just in conversation.
19    Q.  Are you aware of any financial statements
20  of Stonecrest Managers that are more current than
21  Exhibit Number 10?
22    A.  I'm not aware.
23    Q.  Okay.  Are you aware of any audited
24  financial statements of Stonecrest Managers?
25    A.  I am not.

Page 60

1    Q.  Does Stonecrest Managers employ an
2  account -- a professional accounting firm, do you
3  know?
4    A.  I don't know.  Sorry.
5    Q.  Will you look at document number -- Exhibit
6  Number 11, please?
7    THE REPORTER:  Would this be a good time to
8  take a very short break?
9    MR. SEARLES:  It's fine with -- it's fine
10  with me.
11    THE REPORTER:  Okay.  Just real short.
12    VIDEOGRAPHER:  This will marked the end of
13  tape 1.  We'll go off record at 11:38 a.m.
14    (Pause in proceeding.)
15    VIDEOGRAPHER:  This marks the beginning of
16  tape 2, volume 1, in the deposition of John Hope.  We
17  are on the record at 11:47 a.m.
18    Q.  BY MR. SEARLES:  I think -- you don't have
19  in front of you Number 11; is that correct?
20    A.  Yes.  She just -- she gave it to me, yes.
21    Q.  Oh, okay.
22    A.  Yeah.
23    Q.  So we already got to this?
24    A.  No.  You were about to ask me.
25    Q.  All right.  Thank you.  The top of the

15  (Pages 57 to 60)

Page 61

1   document refers to Spiegel Accountancy Corp. Do you
2   see that?
3       A.  Yes.  So in answer to --
4       Q.  Do you --
5       A.  In answer to your previous question, I
6   would assume that that would be the accounting firm
7   that they hired to prepare their taxes.
8       Q.  Do you know that for a fact, or that's just
9   what you're --
10      A.  That's --
11      Q.  -- basing that on --
12      A.  -- that's what I'm --
13      Q.  -- what you see?
14      A.  -- that's what I'm seeing here.
15      Q.  Have you ever seen this document before?
16  Have you reviewed it before?
17      A.  Let me take a look.  I may have.  I'm not
18  sure.
19      Q.  Based on this document, or on the financial
20  statement you were looking at before, which is
21  Exhibit Number 10, do you have an opinion as to the
22  net worth -- the amount of the net worth of
23  Stonecrest Managers?
24      A.  I'm not an accountant, so no, I probably
25  wouldn't have an opinion.

Page 62

1       Q.  As far as you know, the document that's
2   been marked as Exhibit 11, is that an authentic and
3   true copy of the tax returns --
4       A.  As far as I know.
5       Q.  -- for the year end --
6       A.  As far as I know, yes.
7       Q.  -- for the year ended December 31, 2011?
8       A.  Yes.
9       Q.  And that includes the California state
10  income tax return as well; correct?
11      A.  What page would that be on?
12      Q.  They're not numbered.  It's a little more
13  than halfway through.  It appears to be the
14  California S Corporation Franchise or Income Tax
15  Return?
16      A.  I'm still going.  California S Corp.
17      Q.  Right.  If you look at the -- actually,
18  these are numbered, starting with the four-page --
19  it's number 1.  I'm looking at page 11, at the
20  bottom.
21      THE REPORTER:  Counsel, just so you know, I
22  numbered them consecutively, 1 through, I believe,
23  58.  I marked my exhibits.  So he's looking at a
24  different number, so ignore the pin number.  No,
25  that's the exhibit number.  Thanks.

Page 63

1       THE WITNESS:  Which page are you taking a
2   look at?
3       Q.  BY MR. SEARLES:  Well, at -- at the very --
4   at the top, it says "Page 2, question 3."  At the
5   bottom, it's page number 11.
6       MR. PERR:  Probably 15 on her numbering.
7       Q.  BY MR. SEARLES:  By the reporter's
8   numbering, it could be 15.
9       A.  Page 2, question 3, domestic corp?
10      Q.  Yeah.
11      A.  Is that what we're looking -- statement
12  number 7?
13      Q.  Correct.
14      A.  Okay.
15      Q.  First box, it refers to something called
16  Kiwi and Company.
17      A.  Okay.
18      Q.  Do you know what Kiwi and Company is?
19      A.  I believe that -- to the best of my
20  knowledge, it's another -- a different entity.  It
21  has the same address.  That would be the -- my best
22  guess.
23      Q.  The same address as what?
24      A.  4300 Stevens Creek Boulevard, Suite 275.
25      Q.  Yeah, but is that also the address of

Page 64

1   something else?
2       A.  Stonecrest Managers.
3       Q.  Go back two pages to, it would be, page 9
4   on the original document.
5       MR. PERR:  13 on hers.
6       Q.  BY MR. SEARLES:  13 on yours.
7       A.  "Ordinary income (loss) and other
8   partnerships"?
9       Q.  Yeah.  If you go down to the third
10  category, it says, "Compensation of officers"?
11      A.  Okay.
12      Q.  And there's a name of the officer, which is
13  Mr. Freeman?
14      A.  Yes.
15      Q.  And this seems to indicate he owns
16  100 percent of the stock of Stonecrest Managers; is
17  that your understanding, too?
18      A.  Seems to be what it indicates, yes.
19      Q.  And it states a certain amount of
20  compensation for Mr. Freeman.  Do you know whether he
21  was paid any compensation in addition to what's
22  disclosed there?
23      A.  I do not.
24      Q.  Has -- do you know whether Stonecrest
25  Managers, Inc., has ever been put up for sale?

16  (Pages 61 to 64)

Stonecrest Managers, Inc. (SMI)

**ASSETS**

**Cash**

| | | | |
|---|---|---|---|
| 10100-00 | Cash In Bank - General | $ 72,896.37 | |
| 10110-00 | Money Market Managers, Inc. | $ 96,051.31 | |
| | **Total Cash:** | | $ 168,947.68 |

**Other Current Assets**

| | | | |
|---|---|---|---|
| 18510-00 | Advances | $ 2,000.00 | |
| | **Total Other Current Assets:** | | $ 2,000.00 |

**Other Receivables**

| | | | |
|---|---|---|---|
| 17111-00 | Allowance for Doubtful Accounts | $-96,032.00 | |
| 17500-00 | Management Fee Receivable:PCF | $ 23,510.26 | |
| 17500-05 | Management Fee Receivable:CCIF | $ 61,274.47 | |
| 17500-06 | Management Fee Receivable:SIF | $ 3,890.74 | |
| 18220-00 | Other Receivable | $ 86,719.45 | |
| | **Total Other Receivables:** | | $ 79,362.92 |

**Fixed Assets**

| | | | |
|---|---|---|---|
| 15000-00 | Furniture and Fixtures | $ 14,839.30 | |
| 15500-00 | Software | $ 46,360.38 | |
| 15995-00 | Accumulated Deprec. | $-14,839.30 | |
| 15996-00 | Accumulated Amort. | $-41,992.00 | |
| | **Total Fixed Assets:** | | $ 4,368.38 |

**Other Assets**

| | | | |
|---|---|---|---|
| 18100-00 | PrivateCapitalLLC MembrInvest | $ 41,268.85 | |
| 18295-00 | Interco - Receivable | $ 1,523,526.11 | |
| | **Total Other Assets:** | | $ 1,564,794.96 |
| | **Total ASSETS:** | | $ 1,819,473.94 |

**LIABILITIES**

| | | | |
|---|---|---|---|
| 20700-00 | Accounts Payable | $-2,000.00 | |
| 22050-00 | Other Payables | $ 78,439.03 | |
| | **Total LIABILITIES:** | | $ 76,439.03 |

**EQUITY**

| | | | |
|---|---|---|---|
| 30100-00 | Capital Stock | $ 150,000.00 | |
| 32000-00 | Retained Earnings-Current Year | $ 143,806.46 | |
| 32000-00 | RETAINED EARNINGS - PRIOR | $ 1,052,837.44 | |
| 32100-00 | Retained Earnings | $ 396,591.01 | |
| | **Total EQUITY:** | | $ 1,743,034.91 |
| | **Total LIABILITIES & EQUITY:** | | $ 1,819,473.94 |

Exhibit 10

J. Hope

10/26/2012

Income Statement - YTD

For The 12 Periods Ended 12/31/2011

Stonecrest Managers, Inc. (SMI)

|  | | Year to Date | % of Revenue |
|---|---|---|---|
| **REVENUE** | | | |
| Loan Fees | | 142,328.79 | 8.88 |
| Processing Fees | | 7,130.00 | 0.45 |
| Advance Fees | | 11,127.58 | 0.69 |
| Postponement Fees | | 350.00 | 0.02 |
| Interest Income | | 3,911.86 | 0.24 |
| Other Income - PCF Series A | | 7,444.29 | 0.46 |
| Default Interest | | 4,231.54 | 0.26 |
| Admin Fee | | 4,895.00 | 0.31 |
| Late Fee | | 28,245.61 | 1.76 |
| Management Fee Income - PCF | | 503,892.08 | 31.45 |
| Management Fee Income - CCIF | | 785,076.15 | 49.01 |
| Mgmt Fee Income:SIF | | 27,379.56 | 1.71 |
| Servicing Income | | 75,970.00 | 4.74 |
| | Total REVENUE: | 1,601,982.46 | 100.00 |
| | GROSS PROFIT: | 1,601,982.46 | 100.00 |
| **EXPENSES** | | | |
| Personnel Expenses | | | |
| Commission | | -6,664.55 | -0.42 |
| Underwriting Commission | | 230,000.00 | 14.36 |
| Education/Seminars | | 8,882.08 | 0.55 |
| Insurance | | 15,960.00 | 1.00 |
| Payroll Taxes | | 41,778.51 | 2.61 |
| Salaries | | 443,382.19 | 27.68 |
| Paychex Service Fees | | 2,919.53 | 0.18 |
| | Total Personnel Expenses: | 736,257.76 | 45.96 |
| General & Administrative | | | |
| Advertising | | 39,549.21 | 2.47 |
| Bank Charges | | 107.60 | 0.01 |
| Dues & Subscriptions | | 5,505.83 | 0.34 |
| License & Fees | | 4,825.99 | 0.30 |
| Office Supplies | | 8,137.37 | 0.51 |
| Postage & Shipping | | 279.62 | 0.02 |
| Priority Shipping | | 217.42 | 0.01 |
| Printing | | 12,758.89 | 0.80 |
| Other expenses | | 1,668.91 | 0.10 |
| | Total General & Administrative: | 73,050.84 | 4.56 |
| Professional Fees | | | |
| Accounting & Tax | | 9,657.50 | 0.60 |
| Consulting | | 87,203.43 | 5.44 |
| Legal Fees | | 6,099.50 | 0.38 |
| Outside Services | | 137,697.98 | 8.60 |
| | Total Professional Fees: | 240,658.41 | 15.02 |
| Travel & Entertainment | | | |
| Meals & Entertainment | | 26,037.35 | 1.63 |
| Auto Expense | | 856.29 | 0.05 |
| | Total Travel & Entertainment: | 26,893.64 | 1.68 |
| Occupancy | | | |
| Telephone | | 357.74 | 0.02 |
| R & M | | 5,604.04 | 0.35 |
| Web Updates & Maint. | | 5,640.00 | 0.35 |



Income Statement - YTD

For The 12 Periods Ended 12/31/2011

Stonecrest Managers, Inc. (SMI)

| | | Year to Date | % of Revenue |
|---|---|---|---|
| | Total Occupancy: | 11,601.78 | 0.72 |
| **Operating Expenses** | | | |
| Contributions | | 5,977.52 | 0.37 |
| Credit Reports | | 1,920.25 | 0.12 |
| Travel Expenses | | 18,734.70 | 1.17 |
| Interest Expenses | | 3,808.20 | 0.24 |
| | Total Operating Expenses: | 30,440.67 | 1.90 |
| | Total EXPENSES: | 1,118,903.10 | 69.84 |
| | NET INCOME FROM OPERATIONS: | 483,079.36 | 30.16 |
| **OTHER INCOME AND EXPENSE** | | | |
| **Other Expenses** | | | |
| Amortization | | -4,523.00 | -0.28 |
| | Total Other Expenses: | -4,523.00 | -0.28 |
| **Other Expenses** | | | |
| Software | | -20,590.95 | -1.29 |
| Overhead Allocation | | -313,278.65 | -19.56 |
| Depreciation Expense | | -1,080.30 | -0.07 |
| | Total Other Expenses: | -334,949.90 | -20.91 |
| | Total OTHER INCOME AND EXPENSE: | -339,472.90 | -21.19 |
| | EARNINGS BEFORE INCOME TAX: | 143,606.46 | 8.96 |
| | Net Income (Loss): | 143,606.46 | 8.96 |

1      I, CHARLOTTE A. MATHIAS, a Certified

2    Shorthand Reporter of the State of California, duly

3    authorized to administer oaths, do hereby certify:

4         That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given.

12        Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript was not required.

16        I further certify I am neither financially

17   interested in the action or a relative or employee

18   of any attorney or party to this action.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: 4/9/12

23

24   _____

         CHARLOTTE A. MATHIAS, CSR 9792
25            State of California

## CERTIFICATE OF SERVICE

I, David A. Searles, hereby certify that, on this date, I caused a true and correct copy of

the foregoing to be served via electronic mail, upon the following:

**Richard J. Perr, Esquire**
Fineman, Krekstein & Harris, P.C.
Mellon Bank Building
1735 Market Street, Suite 600
Philadelphia, PA 19103
215-893-8724


*/s/ David A. Searles*

Dated:  November 27, 2012

- 17 -